**FILED**
U.S. DIST. CT. COURT
EASTERN DISTRICT ARKANSAS

MAY 14 2008

JAMES W. McCORMACK. CLERK
By:_____
DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

NABIL K. BISSADA,                          )
                                           )
        Plaintiff,                         )
                                           ) Civil Action
v.                                         )
                                           ) No. 4-08-CV-0362 JLH·
ARKANSAS CHILDREN'S HOSPITAL,              )
SAMUEL SMITH, JONATHAN BATES,              )
ROBERT D.B. JAQUISS, TIMOTHY MARTIN,       )
MICHELE MOSS, BONNIE TAYLOR,               ) **AMENDED AND**
ROBERT LYLE, SANDRA TAYLOR,                ) **SUBSTITUTED**
DEBRA BARROW, PATTI HIGGINBOTHAM,          ) **COMPLAINT**
AND JOHN AND JANE DOES 1-10                )
                                           )
        Defendants.                        )
_____)

Plaintiff Nabil K. Bissada, M.D., seeks injunctive relief, monetary,

and punitive damages from Defendants Arkansas Children's Hospital,

Samuel Smith, Jonathan Bates, Robert D.B. Jaquiss, Timothy Martin,

Michele Moss, Bonnie Taylor, Robert Lyle, Sandy Taylor, Debra Barrow,

Patti Higginbotham, and John and Jane Does 1-10, as follows:

## NATURE OF THE ACTION

1.      Plaintiff Nabil K. Bissada is a prominent pediatric

urologist with an international reputation. He has served his patients

exceptionally well for three decades since he completed his residency. At all

relevant times he has been a physician licensed and in good standing with the Arkansas State Medical Board, and a professor in urology at University of Arkansas for Medical Sciences (UAMS).

2.      Plaintiff was instrumental in rebuilding the pediatric urology department at Defendant ACH.  Defendants, however, wrongfully opposed and harmed Plaintiff because of his ethnicity and potential competition, and as retaliation against his legitimate complaints.

3.      Plaintiff is of Egyptian descent just as two of his predecessors at Defendant ACH were.   Defendant Samuel Smith had destroyed the career of the two predecessor physicians, and then proceeded to destroy the reputation and career of Plaintiff, the third physician of Egyptian descent at Defendant ACH.

4.      Defendants' racial discrimination, anticompetitive acts, retaliation and other wrongdoing described below were largely confirmed by Defendant ACH's own consultant, which it hired to investigate this matter. The Equal Employment Opportunity Commission (EEOC) granted Plaintiff a "right to sue" letter on January 29, 2008, attached as Exhibit A.

## JURISDICTION AND VENUE

5.      This Complaint is brought based on Equal Rights under the law pursuant to 42 U.S.C. § 1981 and § 1985, for which this Court has

jurisdiction under 28 U.S.C. §§ 1331 and 1343; under the Sherman Act, 15 U.S.C. § 2, including equitable relief against continuing violations based on Section 16 of the Clayton Act, 15 U.S.C. § 26, for which this Court has jurisdiction under 28 U.S.C. § 1337; under Title VI of the Civil Rights Act of 1964, for which this Court has jurisdiction under 42 U.S.C. § 2000d, *et seq.*, and 28 U.S.C. § 1343(a)(4); and under Title VII of the Civil Rights Act of 1964, as amended, for which this Court has jurisdiction under 42 U.S.C. § 2000e-5 and 28 U.S.C. § 1343(a)(4); and under state law claims of discrimination, retaliation, defamation and tortious interference with contract and prospective business relations, for which this Court has supplemental jurisdiction under 28 U.S.C. § 1367.

6.    Venue is proper in the United States District Court for the Eastern District of Arkansas under 15 U.S.C. § 22 and 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to this claim occurred in this District, and these activities affect interstate commerce and trade. Moreover, Defendants are located in this District. With respect to the Title VII claim, venue is also based on 42 U.S.C. § 2000e-5.

## THE PARTIES

7.    Plaintiff Nabil K. Bissada ("Bissada") has been and continues to be an Arkansas physician in good standing who resides and

3

practices medicine in Little Rock, Arkansas.

8.     Defendant Arkansas Children's Hospital ("ACH") is a non-profit hospital located in Little Rock, Arkansas.

9.     Defendant Samuel Smith ("Smith") was Chief of Surgery at ACH during all times relevant to the Plaintiff's claims, and resides in or near Little Rock, Arkansas.

10.     Defendant Jonathan Bates ("Bates") was President and Chief Executive Officer at ACH during all times relevant to the Plaintiff's claims, and resides in or near Little Rock, Arkansas.

11.     Defendant Robert D.B. Jaquiss ("Jaquiss") was a cardiac surgeon subsidized at high income levels by ACH at all times relevant to the Plaintiff's claims, and resides in or near Little Rock, Arkansas.

12.     Defendant Timothy Martin ("Martin") was Chief of Anesthesiology at Defendant ACH during relevant times, and resides in or near Pulaski County, Arkansas.

13.     Defendant Michele Moss ("Moss") was Chief of Staff at ACH during relevant times, and resides in or near Little Rock, Arkansas.

14.     Defendant Bonnie Taylor was the Medical Director of ACH during relevant times, and resides in or near Little Rock, Arkansas.

15.     Defendant Robert Lyle was a pediatrician having

privileges at ACH during relevant times, and resides in or near Little Rock, Arkansas.

16.        Defendant Mrs. Sandra Taylor, R.N., was Vice President of ACH during relevant times, and resides in or near Little Rock, Arkansas.

17.        Defendant Debra Barrow, R.N., was employed in the Urology Department of ACH during relevant times, and resides in or near Little Rock, Arkansas.

18.        Ms. Patti Higginbotham ("Higginbotham") was Vice President of Medical Affairs for ACH during relevant times, and resides in or near Little Rock, Arkansas.

19.        John and Jane Does 1-10 are yet to be identified as named Defendants and are likely to be discovered during this case.

## FACTUAL BACKGROUND

20.        Plaintiff Nabil K. Bissada, M.D., completed his urology residency at the University of North Carolina at Chapel Hill.

21.        Plaintiff is a renowned urologist with an international reputation as a fine surgeon.

22.        Plaintiff has been a full professor of medicine in the specialty of urology since 1987.

23.        Plaintiff is currently executive vice chairman of the

department of urology, University of Arkansas for Medical Sciences (UAMS), and until April 15, 2008, served as interim chairman of that department.

24.     Throughout his career, Plaintiff has trained about 50 urology residents, virtually all of whom became respected urologists in communities and institutions throughout the United States.

25.     Plaintiff was recruited to and joined the staff of ACH in or about May 2003, in an attempt to resuscitate the urology service at ACH and to revive UAMS's residency program in urology, which was having difficulties and was in imminent danger of losing accreditation due to problems at ACH.

26.     Plaintiff spent a great deal of time and energy correcting the numerous deficiencies and problems at ACH, with visible success.

27.     Due mostly to Plaintiff's efforts, the program was accredited and the numbers of residents were restored to strong levels.

28.     Dr. Alex Finkbeiner, Professor and Chair of Urology at the time said "Dr. Bissada was the only urologist at ACH who performed the larger scope of pediatric urology procedures."

29.     Dr. Finkbeiner described to a consultant hired by ACH, Saul P. Greenfield, M.D., Director, Department of Pediatric Urology,

Children's Hospital of Buffalo ("ACH's consultant"), "Plaintiff's arrival resulted in a rescue of the department's accreditation. Plaintiff has had a long and distinguished academic career."

30.    As confirmed by the ACH's consultant, Dr. Greenfield, in his report dated June 30, 2004, "The residents are very supportive of Plaintiff and his efforts to teach them. Prior to his arrival they had no pediatric urologic teaching and the certification of the residency program was in jeopardy."

31.    Outside urological reviewers analyzed Plaintiff's records and found his work to be entirely within the "accepted standard of current pediatric urologic practice."

32.    The Arkansas State Medical Board examined the allegations against the Plaintiff described below and cleared him, essentially finding no basis for the allegations.

33.    The administration of ACH had information, from several sources including its own consultant's report, that the other pediatric urologist, Dr. John Redman, was treated very differently from Plaintiff at ACH. Dr. Redman, a white physician of European national ethnicity, was given preferential treatment, while Plaintiff, a member of a minority group, was treated harshly and unfairly, as described below.

Anti-Competitive Denial of Access to the Robotic Surgery System

34.     By 2003, ACH had purchased an expensive robotic surgical system (the "da Vinci" surgical system) at a cost of about one and one-half million dollars ($1,500,000), but grossly underutilized this remarkable technology.

35.     Plaintiff requested use of this remarkable system for laparoscopic urology, an area in which he was very experienced.

36.     Defendant Smith, the Chief of General Surgery, publicly threatened to penalize Plaintiff by reporting him to the National Practitioner Data Bank (NPDB), thereby ruining his career in and outside ACH, if Plaintiff pursued his request to use the robotic system.

37.     Defendant Smith wished to and sought to expand his control of the management and finances of all surgical specialties, including the urology service. Defendant Smith viewed Plaintiff as an obstacle to Smith's expansion of his control over the management and finances of all surgical specialties, including the urology service.

38.     Defendant ACH allowed the white general surgeons of European ethnicity to utilize the robotic equipment, but Defendants Smith and ACH refused to allow Plaintiff to use it for the benefit of his patients.

39.     The general surgeons thereby discriminated and maintained a monopoly over use of the robotic surgery system, to the detriment of the Plaintiff and his patients.

40.     ACH's consultant observed in his report:

> Recently a robot was acquired by the hospital. Access to the robot was denied to pediatric urology. After protest, general surgery provided credentialing guidelines for use of the robot, but they seem capricious and onerous. For example, independent privileges cannot be granted until after [performance of 10] proctored cases by one of the general surgeons. At present the general surgeons who are using the robot have not done [10] cases each and it is not clear they will make themselves readily available for proctoring.

<u>Discriminatory Disparagement of Plaintiff</u>

41.     Meanwhile, Defendant Smith attacked Plaintiff by spreading false and derogatory rumors.

42.     In turn, other personnel at Defendant ACH undermined Plaintiff in a number of ways, including by spreading false rumors and innuendo questioning Plaintiff's competence and ability to communicate.

43.     Defendant ACH's consultant disproved these rumors: "Neither the nurses nor the families may be familiar with [Plaintiff's] mannerism or accent, although I had no difficulty speaking with him."

44.     The other urologist, Dr. Redman, had also been accused of communication problems. The outside consultant said, "There is poor communication between him [Dr. Redman] and the pediatric nephrologists."

45.      Nevertheless, no action was taken against Dr. Redman's privileges.

46.      Defendant ACH's consultant noted the impression that "the general surgery chief [Defendant Smith] has been particularly vocal in disparaging Plaintiff."

47.      Defendant Smith persuaded a nurse, Defendant Debra Barrow, the other pediatric urologist (Dr. Redman), and ACH administration to defame, badmouth, and interfere with Plaintiff's relations with his patients and their parents/families as well as with other providers and with hospital employees.

48.      Defendant Smith told the Plaintiff that "you are not one of us," thereby denigrating Plaintiff's ethnicity.

49.      Plaintiff complained about the discrimination against him to Defendants Bates and the Medical Director Bonnie Taylor, to no avail.

50.      Instead of addressing and correcting the problem, Defendant ACH allowed and encouraged the unfair disparagement against Plaintiff to escalate unchecked. As described further below, Defendants ultimately staged a discriminatory bad faith ("sham") peer review to harm Plaintiff.

## Discrimination in Scheduling

51.        Defendant ACH refused and often cancelled Plaintiff's surgeries, making it difficult for him to optimize his schedule.

52.        Defendant ACH provided Dr. Redman, a colleague of Plaintiff in the urology department at ACH, with preferential treatment, while Defendant ACH often cancelled Plaintiff's cases.

53.        Plaintiff repeatedly requested that ACH hire an advanced practice nurse (APN) to alleviate the scheduling problems and enable the urologists to perform more surgeries with less waiting time.

54.        Defendant ACH had implemented procedures to deal with its known scheduling delays in their urology clinic and hospital-wide, dating prior to Plaintiff's arrival at ACH, but the problems persisted.

55.        Rather than take appropriate action to address the understaffing problem, ACH did nothing to alleviate the scheduling bias or employee shortage.

## Whistle-Blowing by Plaintiff

56.        Plaintiff began complaining to ACH administration about scheduling delays and staffing at ACH in 2005.

57.        Plaintiff held meetings to complain about the problems, and sent a letter about the problems to two members of the ACH

administration, Defendants Bonnie Taylor and Jonathan Bates.

58.     Email correspondence among staff at Defendant ACH, including Carol L. Graham, Vice President, Ambulatory Care Services at ACH, and multiple parties, including Defendant Bates, the President and CEO of Defendant ACH, confirmed that the scheduling problem was widespread and not caused by Plaintiff. For example, ACH Vice President Graham received an email dated July 24, 2007, which stated, "I think the scheduling fiasco needs urgent review as a single issue item. Based on the ongoing, varied types of problems I strongly suspect there are fundamental systems flaws that may not be addressed by the plan outlined below." The ACH consultant described scheduling as "chaotic".

59.     Delays in operating on urology patients due to the manpower shortage were further addressed by an ACH Vice President Defendant Sandra Taylor, who quoted waiting time for surgery up to eight (8) months. She unambiguously recommended hiring an advanced practice nurse (APN) to staff several clinics weekly and allow the urologists to perform more surgery and thus shorten the waiting time for surgery. She confirmed that Plaintiff was working so hard that she believed it "is not sustainable long term."

60.     Defendant Bates chose to ignore her recommendation also.

61.     Instead, Defendants shifted responsibility for the known problem with scheduling onto Plaintiff, claiming that scheduling delays were somehow caused by him.

62.     Defendants ACH, Bates and Jaquiss, used this false charge as their primary reason for terminating Plaintiff's privileges in the sham peer review described further below.

63.     Defendant Bates, the President and CEO of ACH, admitted to Dr. Finkbeiner (when the latter was the Chair of urology at UAMS and the Plaintiff's supervisor) that Defendant Bates sought to remove Plaintiff from ACH.

64.     When Dr. Finkbeiner inquired into the reasons for this request, defendant Bates failed to provide any valid reason.  He waited until Dr. Finkbeiner stepped down, and Plaintiff was appointed as interim Chair, to carry on the sham peer review, thereby denying Plaintiff the benefit of a Chair's input.

65.     In 2005, Plaintiff had also complained about understaffing at Defendant ACH, a critical factor in scheduling delays.

66.     Plaintiff recommended that the hospital increase its manpower to three fulltime urologists and requesting hiring an APN to meet the pressing clinical demands.

67.    Defendants ACH and Bates claimed that an APN position was not in the budget.

68.    Instead of taking appropriate action to address the understaffing issue, Defendant ACH retaliated against Plaintiff.

### Discriminatory Complaints

69.    When minor, routine issues arose which were identical with respect to Plaintiff and a white colleague of European ethnicity, Dr. John Redman, only Plaintiff was accused of a violation by Defendant ACH.

70.    For example, for decades, the "on call" schedule was covered by all UAMS urologists, and the on call schedule is published. This longstanding arrangement was (and still is) published monthly and supplied to ACH administration, as confirmed by the ACH's own consultant report. For decades, there were (and still are) numerous occasions when no pediatric urologist was (is) in town, but Defendants never cited such occasions as violations.

71.    At one time, both Plaintiff and Dr. Redman were out-of-town and were not listed on the on call schedule. Defendant ACH accused only Plaintiff with an alleged violation.

72.    Plaintiff was accused of a violation even though, as usual, UAMS urologists trained to handle both adult and pediatric emergencies

were available and officially listed on the on call schedule that was in the possession of the ACH administration, as it usually is. Dr. Redman was not similarly accused of a violation for being out of town.

73.    White general surgeons of European ethnicity had several serious complications when they performed complex urological procedures, which the ACH described as surgical disasters, and yet they were never subjected to the harsh measures that Plaintiff suffered for trivial accusations. Defendant ACH imposed harsh adverse actions against Plaintiff for fabricated and insignificant issues while ignoring far more serious surgical catastrophes by white general surgeons of European ethnicity.

74.    Dr. Redman had surgical complications at a comparable or worse rate as Plaintiff, yet ACH elected to disregard Dr. Redman's complications and reviewed Plaintiff's charts on a discriminatory basis instead.

75.    Although many of Plaintiff's procedures were highly specialized and complex, he had no mortality among his patients and his complication rate was lower than the local or national average and was among the best in the nation.

76.    Defendant ACH selected charts of Plaintiff for peer review without any objective basis. As determined by an outside urology reviewer,

15

"there appears to be no basis for the selection of these cases from the approximately 1000 cases done by Plaintiff."

77.     Urology residents, who had every reason to be objective, observed that "a 'hatchet job' is being performed on Plaintiff" by Defendants, as quoted in ACH's own consultant's report.

### Discriminatory Sham Peer Review

78.     Defendant ACH subjected Plaintiff to a discriminatory, bad faith ("sham") peer review, in violation of its own bylaws and basic rules of fairness.

79.     Defendant Smith had threatened Plaintiff with a peer review and a subsequent reporting of Plaintiff to the National Practitioner Data Bank (NPDB), thereby ruining Plaintiff's career not only at ACH but at all other hospitals.   In 2003, Plaintiff informed his Chairman Dr. Alex Finkbeiner, and the President of ACH, Defendant Bates, as well as the ACH medical director Defendant Dr. Bonnie Taylor, about Defendant Smith's threats.

80.     The threats against and harassment of Plaintiff continued in 2004, 2005 and 2006.

81.     In or about November 2006, a sham peer review was initiated with the support of all Defendants, including Defendants Moss and

Higginbotham.

82.     The sham peer review relied on Defendant Debra Barrow, a nurse who was prejudiced against Plaintiff and allied with Defendant Smith, to collect a list of 18 cases against Plaintiff. In fact, all these patients were managed well, without exception.

83.     The list of charts to review was based on a list of patients compiled by this hospital employee for the purpose of attacking Plaintiff via "peer review."

84.     Defendant Barrow had previously threatened Plaintiff privately and publicly at Defendant Smith's behest. On one of these occasions, she even used a handwritten list of patient's names and numbers to threaten Plaintiff.

85.     There was no reasonable basis for pulling the 18 specific charts for review.

86.     Independent, outside urological reviewers confirmed that all these cases complied with good standards and had favorable outcomes.

87.     Nevertheless, an Ad Hoc Committee was formed with three persons who were under the control and influence of Defendant ACH by virtue of its preferential treatment of them.

88.     One member of the Ad Hoc Committee, Defendant

Jaquiss, was a cardiac surgeon enjoying an annual salary of at least one million dollars, subsidized primarily by ACH.

89.     The second member of the Ad Hoc Committee was Defendant Dr. Timothy Martin, the Chief of Anesthesiology at ACH, who was benefiting from a favorable contract subsidized by ACH, and was favored by the ACH President in many other ways.  In addition to being under the influence and control of ACH, Martin disliked Plaintiff for trying to implement a minor procedure plan in the clinic that does not involve calling an anesthesiologist for minor surgeries, which would have decreased the revenue to Dr. Martin. Although Plaintiff's minor procedure plan would deprive Dr. Martin of extra income, it would alleviate much hardship for patients' families, improve cost effectiveness and solve some of Defendant ACH's scheduling problems.

90.     The third member of the Ad Hoc Committee was Defendant Dr. Robert E. Lyle, a pediatrician who, like the other two, was also untrained in urology issues.

91.     Defendant ACH repeatedly refused to give Plaintiff information on the subject of the complaints against him or the names of the patients who were alleged in such complaints, in order to prevent him from reviewing the records before he met with the Ad Hoc Committee.

92.    Many of the records were not even available at the meeting, but the Ad Hoc Committee proceeded anyway.

93.    Defendants failed to provide Plaintiff with proper notice of the subjects of complaints against him or names of patients, denying him an opportunity to address the allegations.

94.    The minutes of this Dec. 8, 2006 meeting of the Ad Hoc Committee plainly demonstrate that the purpose of the review was not to obtain facts.

95.    Dr. Jaquiss admitted that they had "thrashed" Plaintiff: "we absolutely thrashed you [referring to Plaintiff] ...."

96.    The Ad Hoc Committee members claimed in their subsequent report dated Dec. 12, 2006, that they had reviewed all 18 cases, but in fact they discussed less than half the cases (only 8 cases).

97.    After producing a report dated Dec. 12, 2006, containing five negative findings against Plaintiff, which the committee members were not qualified to make, the Ad Hoc Committee recommended that the 18 cases should be reviewed by an outside pediatric urologist.

98.    In other words, the committee sought an informed opinion by an appropriate specialist only _after_ it had already rendered its negative findings against Plaintiff.

99.    The    medical    executive    committee    (MEC)    relied exclusively on the Dec. 12, 2006 report by the Ad Hoc Committee and copied its exact wording to recommend immediate revocation of Plaintiff's privileges.    In other words, Defendants never utilized the report by the outside reviewer and his report made no difference whatsoever in the decision of the medical executive committee.

100.    In its report, the Ad Hoc Committee blamed only Plaintiff for persistent and pervasive scheduling problems and other hospital deficiencies, despite the fact that the scheduling problems were well-known and hospital-wide for years, and despite the knowledge of the committee that manpower problems and the other issues raised were exclusively a result of hospital failures and inaction by Defendants ACH and Bates.

101.    The    Ad    Hoc    Committee    criticized    Plaintiff    for occasionally referring patients to Dr. Redman so that timelier surgery could be performed.

102.    In fact, information was presented to the Ad Hoc Committee that Dr. Redman likewise referred patients to Plaintiff so that more complicated or specialized surgery could be performed by Plaintiff, but this did not result in similar criticism of Dr. Redman.

103.    On January 9, 2007, Defendant ACH unexpectedly and abruptly suspended Plaintiff's privileges and immediately notified insurance carriers.  This suspension of Plaintiff directly violated the applicable ACH Bylaws, which restrict immediate or summary suspension to very limited circumstances such as when there are reasonable grounds to believe that the individual poses an immediate threat to the life or safety of others at ACH and that failure to take a prompt action may result in harm to such individuals.

104.    Defendant ACH failed to provide Plaintiff with proper prior notice of the Dec. 8th meeting or to allow him the opportunity to review the records and prepare for the meeting.  In spite of Plaintiff repeatedly requesting this information, ACH refused to supply this information.

105.    Defendant ACH also denied Plaintiff access to important medical executive committee meetings, including meetings that impacted Plaintiff personally, despite Plaintiff's membership on the committee.  ACH lawyers (not MEC lawyers) were present at several of the medical executive committee meetings.

106.    The members of the Ad Hoc Committee were not qualified to perform a proper peer review outside of their specialties, yet they produced a report containing five negative false findings against Plaintiff,

including the absurd conclusion that "[t]hese issues indicate a general lack of judgment on the part of Plaintiff."

107.    In the Ad Hoc Committee meeting on Dec. 8, 2006, Defendant Jaquiss argued that "absence of proof is not proof of absence," reaching the inappropriate and absurd conclusion that their inability to show that the Plaintiff made errors does not prove that there were no errors.

108.    Defendant Jaquiss further declared that just because treatment of a urologic condition or a procedure is in the standard urology textbook does not make it right.

109.    On another occasion, Defendant Jaquiss ignored the fact that there are well-established rates for side effects, and that Plaintiff's complications were lower than national average (and among the best nationally).

110.    Defendant Jaquiss is a cardiac surgeon and, like the other members of the committee, had no urology training or expertise.

111.    Reviewing cases outside of one's specialty is akin to practicing medicine outside of one's specialty, and it is not only unacceptable, but objectively unreasonable.

112.    Defendant ACH's allegations against Plaintiff were of a trivial nature, and were cleared by four independent, qualified urologists.

113.    Similarly, the Arkansas Medical Board subsequently examined the allegations and cleared Plaintiff, who remains a physician in good standing with the medical board.

114.    Defendants did not undertake the peer review of Plaintiff in the reasonable belief that the action was in the furtherance of quality health care.

115.    Defendants did not undertake the peer review of Plaintiff after a reasonable effort to obtain the facts of the matter.

116.    Defendants did not undertake the peer review of Plaintiff after affording adequate notice and hearing procedures or other fair procedures to him.

117.    Defendants did not undertake the peer review of Plaintiff in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain them.

118.    On August 20, 2007, Defendant ACH reported the event to the National Practitioners Data Bank without any hearing.

119.    Defendants' actions resulted in Plaintiff's loss of reputation, embarrassment, belittlement, and loss of his ability to obtain similar privileges or jobs.

120.    Defendants' actions proximately caused significant

economic consequences, and inflicted severe physical and emotional damage on Plaintiff and his family.

121.     In addition to the damage to Plaintiff and his family, Defendants' actions also caused substantial harm to patients and the community.  Plaintiff performed a wide spectrum of advanced procedures that were not provided by anyone else at ACH and which have not since become available.

122.     Plaintiff was the third Egyptian Copt to be harmed by Defendants.

123.     Defendants' actions additionally fostered fear among physicians to the detriment of the quality and improvement of patient care.

## FIRST CLAIM FOR RELIEF (FOR VIOLATION OF EQUAL RIGHTS UNDER THE LAW (42 U.S.C. § 1981))

124.     Plaintiff incorporates herein all statements and allegations contained in paragraphs 1 through 123 above.

125.     Plaintiff, being of Egyptian descent, is a member of a protected class.

126.     Defendants treated Plaintiff differently because of his national origin and race, including the discriminatory and retaliatory actions alleged in this Complaint.

127.     Medical staff privileges are contractual pursuant to

medical staff bylaws, or establish the equivalent of a contractual relationship for the purposes of 42 U.S.C. § 1981.

128.    Defendants intended to discriminate against Plaintiff on the basis of race and national origin.

129.    Defendants treated similarly situated white physicians of European ethnicity far better than Plaintiff.

130.    Defendants suspended Plaintiff's medical staff privileges because of his race and national origin. Defendants have not taken such action even for far more serious matters against a similarly situated white physician of European ethnicity.

131.    Defendants' discrimination interfered with the protected activity of Plaintiff in obtaining and maintaining medical staff privileges at ACH and elsewhere pursuant to the contractual obligations of medical staff bylaws.

132.    Defendants' discrimination interfered with the protected activity of Plaintiff in entering into express and implied contracts with patients to provide them with medical services.

133.    Defendant ACH receives federal funds and reimbursement, and pursuant to federal regulations it may not discriminate.

134.    Defendants' actions proximately caused Plaintiff to suffer

direct monetary loss in the form of lost business and income. Plaintiff's monetary loss in the form of lost business and income would not have occurred but for Defendants discriminatory, retaliatory, and unlawful acts.

135.     Defendants' actions proximately caused Plaintiff to suffer further injury in the form of emotional distress, national embarrassment and mental anguish. Plaintiff's emotional distress, embarrassment and mental anguish would not have occurred but for Defendants discriminatory, retaliatory, and unlawful acts.

## SECOND CLAIM FOR RELIEF (FOR CONSPIRACY TO DEPRIVE ONE OF CIVIL RIGHTS (42 U.S.C. § 1985))

136.     Plaintiff incorporates herein all statements and allegations contained in paragraphs 1 through 135 above.

137.     Defendants conspired to deprive Plaintiff of equal protection with respect to medical staff privileges at ACH.

138.     Defendants conspired to deprive Plaintiff of equal privileges and immunities with respect to medical staff privileges at ACH.

139.     Defendants acted in furtherance of the conspiracy, as described above, in recommending review of and taking action against Plaintiff's medical staff privileges at ACH.

140.     Defendant Bates admitted his intentions to exclude Plaintiff from ACH and joined with his co-conspirators to accomplish this

goal.

141.    Hospital manager of medical staff services Becky Foor, acting on behalf of Defendant ACH, acted in furtherance of the conspiracy in filing a false report with the National Practitioner Data Bank (NPDB), as alleged in paragraphs 232 through 253 below and incorporated herein.

142.    Defendants' conspiracy and acts taken in furtherance of it proximately caused injury to Plaintiff. Plaintiff's injuries would not have occurred but for that conspiracy and acts taken in furtherance of it.

### THIRD CLAIM FOR RELIEF
### (FOR MONOPOLIZATION UNDER SECTION TWO OF THE
### SHERMAN ACT, 15 U.S.C. § 2)

143.    Plaintiff incorporates herein all statements and allegations contained in paragraphs 1 through 142 above.

144.    The relevant market is the provision of pediatric urology surgery.

145.    The relevant geographic area is the greater metropolitan area of Little Rock, Arkansas.

146.    Defendant ACH, by its own admission on its website, "is the only pediatric medical center in Arkansas."

147.    Defendant ACH has agreements with others to control all care to young children in the relevant area.

27

148.    At all relevant times, Defendants ACH and Smith asserted and maintained a monopoly over the provision of pediatric surgery in the greater Little Rock area.

149.    Defendants ACH and Smith sought to control the management and finances of all surgical specialties at ACH, and Defendant Smith even admitted as much on several occasions.

150.    Defendant Smith sought to shift urology patients to his services, to take the patients away from the urology department at ACH, and to take control of surgical services away from UAMS.

151.    Defendant Smith knew that Plaintiff was in the process of establishing a world-class urology service at ACH, and this would be more attractive to patients seeking urological surgery than Defendant Smith's general surgery practice.

152.    Dr. Bates, the President and CEO of ACH, encouraged the monopolization of services by Defendant Smith.

153.    Defendants ACH and Smith acted to protect their monopoly by excluding and interfering with access by others, including Plaintiff, to essential facilities, including the surgical robot.

154.    Plaintiff, a competitor of Defendant Smith, had no practical or reasonable means of duplicating this essential facility of the

surgical robot.

155.     Defendants ACH and Smith could easily and feasibly provide the facility, the surgical robot, to Plaintiff because it was constantly underutilized.

156.     Defendant Bates was angered by Plaintiff's resistance to Defendant Smith's scheme to deny access to the surgical robot and to control all the surgical services at ACH at the expense of other surgeons and other facilities.

157.     As alleged above, Defendants engaged in a sham peer review to eliminate Plaintiff from the market.

158.     The general surgeons, who competed with Plaintiff for pediatric urology surgery, had an anti-competitive motive to perpetrate a sham peer review against Plaintiff, as detailed by the hospital's own consultant's report dated June 30, 2004.

159.     Dr. Timothy Martin, an anesthesiologist who served on the ACH Ad Hoc Committee that conducted the sham peer review of Plaintiff, had an anti-competitive motive to criticize Plaintiff for his plan to establish a minor procedure protocol in the urology clinic that does not utilize anesthesiology services for the benefit of Dr. Martin, even though such services were medically unnecessary for many of Plaintiff's patients.

160.    The restraint of trade extended beyond excluding and removing Plaintiff from practice at ACH, and also sought to destroy his reputation and remove him entirely from the market.

161.    As a result of the foregoing actions by Defendants, competition for pediatric urology services has been unreasonably injured.

162.    Patients have thereby denied market choices in receiving pediatric urology surgery.

163.    Many services and procedures provided by Plaintiff have not been available in Arkansas since January 2007, due to Defendants' actions.

164.    Plaintiff has been injured in his business and property as a result of Defendants' foregoing actions, and will continue to suffer injury in the future unless such acts are enjoined and such practices cease.

165.    Pursuant to the acts and practices alleged above, Defendants have monopolized the provision of pediatric urology services in the relevant market in violation of Section 2 of the Sherman Act.

166.    Defendants' acts have proximately caused injury to Plaintiff.

## FOURTH CLAIM FOR RELIEF
## (FOR RETALIATION UNDER THE ARKANSAS WHISTLE-BLOWER ACT, § 21-1-601 *et seq.*)

167.    Plaintiff incorporates herein all statements and allegations contained in paragraphs 1 through 166 above.

168.    Defendant ACH is a "public employer" within the meaning of Section 21-1-602(5).

169.    Defendant ACH trains and educates medical residents on a regular basis, and that educational program is the basis for this Complaint.

170.    Defendant ACH is publicly funded.

171.    Plaintiff was a "public employee" within the meaning of Section 21-1-602(4) because he was hired exclusively to work at ACH pediatric urology service and ACH paid remuneration on his behalf to UAMS.

172.    ACH advertised Plaintiff's services when he joined ACH in 2003.

173.    Dr. Alex Finkbeiner, the Chairman of the Urology Department at UAMS, asked Plaintiff to discuss and address the impediments to the provision of excellent care to his patient with Defendant Smith.

174.    When Plaintiff discussed this problem with Defendant

Smith, Smith became very angry and made Plaintiff a target for retaliation.

175.    The CEO of ACH, Defendant Bates, was unjustifiably annoyed that Plaintiff questioned the wasteful misuse of expensive hospital resources and requested improvements in allocation of resources.

176.    Defendant Bates was also unjustifiably angry that Plaintiff questioned Defendant Smith's attempts to control all surgical services, management, and finance and to weaken or eliminate the affiliation with UAMS.

177.    Defendants retaliated against Plaintiff for his complaints about problems at ACH and for attempting to resolve the issues professionally with Defendant Smith.

178.    Plaintiff seeks immediate reinstatement "to the same position held before the adverse action" through the restoration of his privileges at ACH pursuant to Section 21-1-605(2).

179.    Plaintiff seeks compensation for lost wages, benefits and income resultant from his wrongful suspension, pursuant to Section 21-1-605(3).

180.    Plaintiff seeks payment of his reasonable court costs and attorney's fees pursuant to Section 21-1-605(5).

181.    . Plaintiff seeks injunctive relief against continuing

violations pursuant to Section 21-1-605(1).

## FIFTH CLAIM FOR RELIEF
## (FOR DISCRIMINATION UNDER TITLE VI OF THE CIVIL
## RIGHTS ACT OF 1964, 42 U.S.C. §2000d *et seq.*)

182.    Plaintiff incorporates herein all statements and allegations contained in paragraphs 1 through 181 above.

183.    Plaintiff, being of Egyptian descent, is a member of a protected class under Title VI. Defendants intentionally treated Plaintiff differently because of his national origin and race, including the discriminatory and retaliatory actions alleged in this Complaint. In taking these actions, the individual Defendants (who are all whites of European ethnicity) were motivated by animus based on Plaintiff's race and national origin.

184.    Defendant ACH has been a recipient of federal funds at all relevant times.

185.    Defendant ACH improperly excluded Plaintiff from participation in the programs receiving federal financial assistance.

186.    Plaintiff was an intended beneficiary of federal funding that Defendant ACH received.

187.    The individual Defendants received federal funds at all relevant times and administered federally funded programs by

discriminating against Plaintiff.

188.    Defendant ACH imposed harsh adverse actions against Plaintiff for fabricated and insignificant issues while ignoring far more serious surgical catastrophes by white general surgeons of European ethnicity.

189.    Defendants' discriminatory acts proximately caused injury to Plaintiff, which injuries would not have occurred but for Defendants' discriminatory actions.

## SIXTH CLAIM FOR RELIEF
## (FOR EMPLOYMENT DISCRIMINATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §2000e *et seq.*)

190.    Plaintiff incorporates herein all statements and allegations contained in paragraphs 1 through 189 above.

191.    At all relevant times, Defendant ACH has been an "employer" within the meaning of Title VII and employs more than 500 employees in each of 20 or more calendar weeks in an applicable calendar year.

192.    The substance of the relationship between Defendant ACH and Plaintiff was as employer-employee.

193.    Plaintiff was required to comply with the bylaws and medical staff rules and regulations of Defendant ACH, including serving "on

call" for ACH during nights and weekends, as determined by ACH; Plaintiff

also participated in regular staff meetings as required by ACH.

194.    Defendant ACH further required Plaintiff to provide

follow-up treatment to patients first seen by Plaintiff while "on call," even

though the "on call" period had ended. Moreover, Plaintiff was required to

see and provide outpatient clinic services to ACH patients.

195.    Plaintiff served Defendant ACH as chief of its urology

department, and also served on several ACH committees, including the ACH

medical executive committee.

196.    Plaintiff was required to participate in quality assurance

programs from time to time as a condition of maintaining privileges, and

these programs entailed significant supervision and direction of Plaintiff's

practice.

197.    All of Plaintiff pediatric practice was performed at the

premises of Defendant ACH, and ACH employees controlled patient

scheduling for Plaintiff.

198.    Defendant ACH advertised the services provided by

Plaintiff.

199.    Defendant ACH often specified when and how work must

be performed by Plaintiff and these requirements were often designed to

maximize profits rather than improve the quality of patient care.

200.    Defendant ACH reported Plaintiff to the National Practitioner Data Bank (NPDB), further indicating its close supervisory role over Plaintiff.

201.    Defendant ACH refused to allow Plaintiff to utilize the robotic surgery system, further demonstrating that Defendant exercised control over Plaintiff's procedures.

202.    Defendants exercised substantial control over details and methods of Plaintiff's work.

203.    Members of the administration of Defendant ACH acted as supervisors to Plaintiff's practice, exercising constant surveillance over it and Plaintiff's professional performance.

204.    The control exercised by Defendant ACH over Plaintiff's practice constituted interference that went far beyond issues of quality of care.

205.    For example, Defendants dictated what procedures to allow, such as robotic surgical system or laser utilization, the performance of certain treatment options, and sometimes even the choice of medications to prescribe.

206.    Defendants were motivated by a desire to maximize their

personal revenues and profits.

207.    For example, Defendants insisted that Plaintiff use anesthesiology services at Defendant ACH when they were not medically indicated, simply as a way of increasing revenue for Defendants.

208.    As another example, Defendants refused to allow Plaintiff to use the surgical robot for procedures even though it was medically indicated, simply as a way to preserve monopoly revenue for the general surgery department.

209.    Defendants sought to coerce and compel cooperation by Plaintiff with their demands, using monitoring as a means of enforcing control.

210.    Defendants' demands were not motivated by a desire to comply with external statutes and regulations, but rather were designed to maximize revenue for other departments, personal profit to the individual Defendants, and to discriminate against Plaintiff.

211.    Defendants' control extended beyond health and safety concerns and had financial and discriminatory motivations.

212.    Plaintiff faced the threats of negative peer reviews, remedial programs, and loss of privileges if he did not comply with the control exercised by Defendants.

213.    Defendant ACH paid remuneration to Plaintiff in the form of payments to UAMS on Plaintiff's behalf.

214.    Defendant ACH thereby controlled the practice of Plaintiff and acted for legal purposes as his employer.

215.    The control exerted by ACH over the practice of Plaintiff continued until it permanently excluded Plaintiff from ACH on or about August 20, 2007, in what ACH falsely describes as a settlement.

216.    Plaintiff is a member of a protected group.

217.    Plaintiff was meeting the legitimate expectations of his employer, Defendant ACH.

218.    Plaintiff suffered an adverse employment action by his employer, Defendant ACH, in the form of harassment motivated by and because of Plaintiff's race and national origin, revocation of privileges, denial of a hearing, and ultimate exclusion. If Plaintiff were to reapply for privileges with Defendant ACH in the absence of the requested injunction and declaratory relief, his application would be denied and that event would be reportable to the NPDB.

219.    Defendant ACH imposed harsh adverse actions against Plaintiff for fabricated and trivial issues while ignoring far more serious surgical catastrophes by white general surgeons of European ethnicity.

220.     Defendant ACH treated a similarly situated employee who is white and of European ancestry, Dr. Redman, far better than it treated Plaintiff.

221.     Defendant ACH acted adversely against Plaintiff because of his race and national origin.

222.     Defendant ACH knew or should have known that there was no reportable event on Aug. 8, 2007. However, ACH intentionally and maliciously made its report to the NPDB in order to injure and harm Plaintiff.

223.     Plaintiff received a "right to sue" letter (attached as Exhibit A) from the Equal Employment Opportunity Commission (EEOC) dated January 29, 2008, imposing a deadline of 90 days in which to sue under Title VII.

224.     Defendants' acts have proximately caused severe injury to Plaintiff.

### SEVENTH CLAIM FOR RELIEF (FOR VIOLATION OF ARKANSAS CIVIL RIGHTS ACT, § 16-123-101 *et seq.*)

225.     Plaintiff incorporates herein all statements and allegations contained in paragraphs 1 through 224 above.

226.     Defendant ACH exercised control over Plaintiff's practice in a way that established it as his employer.

39

227.    Plaintiff was meeting the legitimate expectations of ACH.

228.    Plaintiff suffered an adverse employment action as described above.

229.    This adverse action was the result of discrimination against Plaintiff based on his national origin.

230.    Defendants' acts have proximately caused injury to Plaintiff.

## EIGHTH CLAIM FOR RELIEF
## (FOR DEFAMATION)

231.    Plaintiff incorporates herein all statements and allegations contained in paragraphs 1 through 230 above.

232.    The wrongful suspension of Plaintiff lasted less than 30 days because his privileges expired on January 31 and his suspension occurred on January 9, 2007.

233.    Accordingly, the suspension was not a reportable event to the National Practitioner Data Bank (NPDB).

234.    Defendant ACH, however, defamed Plaintiff by filing a statement with the NPDB for what was actually a non-reportable event.

235.    The statement that ACH filed with the NPDB states:

DR. NABIL BISSADA'S PRIVILEGES WERE RECOMMENDED TO BE REVOKED BY THE EXECUTIVE COMMITTEE OF THE ARKANSAS CHILDREN'S

> HOSPITAL MEDICAL STAFF AS A PART OF AN
> INVESTIGATION CONCERNING PLAINTIFF'S
> PROFESSIONAL COMPETENCE. PURSUANT TO THE
> ARKANSAS CHILDREN'S HOSPITAL BYLAWS,
> PLAINTIFFS REQUESTED A HEARING SO THAT HE
> COULD OPPOSE THE ABOVE MENTIONED
> RECOMMENDATION. BECAUSE A SETTLEMENT WAS
> REACHED BETWEEN THE PARTIES, PLAINTIFF'S
> PRIVILEGES EXPIRED BEFORE FINAL ACTION WAS
> TAKEN. PLAINTIFF CHOSE NOT TO REAPPLY FOR
> PRIVILEGES AT ARKANSAS CHILDREN'S HOSPITAL.

236.    No final adverse action had been taken against Plaintiff by

ACH at the time they made the adverse report to the NPDB, and no report

was even warranted.

237.    The above report is false and defamatory in several

respects.

238.    There is no deficiency in Plaintiff's professional

competence.

239.    Plaintiff's privileges expired long before any alleged

settlement was reached.

240.    A settlement was never reached with Plaintiff and he in no

way agreed with the assertions of the Executive Committee.

241.    The NPDB report conveys the false and defamatory

impression that Plaintiff is professionally incompetent and that he agreed

with that statement.

242.    In fact, ACH considered the matter closed and there was no ongoing investigation at the time Plaintiff was forced not to re-apply for privileges.

243.    In fact, Plaintiff had requested a fair hearing pursuant to Article 10.1.1 of the Medical Bylaws of ACH, but was denied the same by ACH by claiming that "a request for another hearing to which you [Plaintiff] are not entitled."

244.    In fact, Plaintiff did not and would not agree to any settlement that falsely impugned his professional competence, as ACH attempted.

245.    There was no reasonable belief on the part of ACH to state or imply that Plaintiff had settled and resigned while under investigation.

246.    ACH thereby caused severe and permanent damage to Plaintiff's medical career.

247.    Plaintiff has suffered lost income as a result of this defamation.

248.    Plaintiff has lost sleep and endured pain and suffering as a result of this defamation.

249.    Defendant ACH's defamation was willful and malicious.

250.    Representatives of Defendant ACH knew the statement

filed with the NPDB was false or misleading.

251.    As a result of ACH report to the NPDB, Plaintiff lost a job offer in another state. There is a significant shortage of pediatric urologists and ACH has tried unsuccessfully to recruit a replacement for Plaintiff.

252.    Defendants' defamation of Plaintiff has proximately caused injury to his reputation and business.

253.    Defendants' defamation of Plaintiff has proximately caused him pain and suffering in the form of significant emotional distress.

### NINTH CLAIM FOR RELIEF
### (FOR TORTIOUS INTERFERENCE
### WITH PROSPECTIVE BUSINESS RELATIONS)

254.    Plaintiff incorporates herein all statements and allegations contained in paragraphs 1 through 253 above.

255.    Plaintiff would have had profitable business relations with patients, for their benefit, in the absence of Defendants' wrongful conduct.

256.    Defendants knew or should have known of Plaintiff's prospective profitable business relations.

257.    Defendants intentionally and maliciously interfered with Plaintiff's prospective relationships.

258.    Defendant's interference was a proximate cause of Plaintiff's losing such prospective profitable business relations.

259.    Defendants' tortious interference also resulted in substantial harm to the pediatric patients in Arkansas by denying them access to many unique services and procedures that are no longer available.

## TENTH CLAIM FOR RELIEF
## (FOR TORTIOUS INTERFERENCE
## WITH CONTRACTS)

260.    Plaintiff incorporates herein all statements and allegations contained in paragraphs 1 through 259 above.

261.    Plaintiff had profitable contractual relations with patients.

262.    Defendants knew or should have known of Plaintiff's profitable contractual relations with patients.

263.    Defendants intentionally and maliciously interfered with Plaintiff's contractual relations with patients.

264.    Defendant's interference was a proximate cause of Plaintiff's losing the benefit of those contracts.

## Jury Demand

265.    Plaintiff requests a trial by jury for all issues able to be tried by jury.

## Prayer For Relief

Wherefore, Plaintiff respectfully requests the following relief, jointly and severally against each Defendant as appropriate:

(i)     That this Court award Plaintiff injunctive relief in the form of immediate reinstatement to the same privileges he held before the wrongful suspension of his privileges at ACH;

(ii)    That this Court award Plaintiff injunctive relief by ordering Defendant ACH to withdraw and rescind its entry against Plaintiff in the NPDB and advise the relevant federal authorities that the entry against Plaintiff was the result of knowing and intentional misrepresentation by ACH personnel;

(iii)   That this Court award Plaintiff compensation for lost compensation, benefits and income determined to have resulted from the wrongful suspension of his privileges;

(iv)    That this Court award Plaintiff three times the damages determined to have been sustained from Defendants' violation of the Sherman Act;

(v)     That this Court award Plaintiff compensatory damages for emotional anguish and mental distress;

(vi)    That this Court award Plaintiff exemplary and punitive damages sufficient to punish Defendants' conduct and deter such conduct in the future;

(vii)   That this Court award Plaintiff reasonable court costs and

attorney's fees; and

(viii)   That this Court award such other relief as it may deem appropriate.

(ix)   That the Court enter a declaratory judgment that the entry against Plaintiff in the NPDB was the result of knowing and intentional misrepresentation by ACH personnel;

(x)   That this Court award Plaintiff injunctive relief that prohibits Defendants from retaliating against Plaintiff for bringing this action; and

(xi)   That this Court award Plaintiff injunctive relief that prohibits Defendants from discriminating against Plaintiff because of race or national origin.

Respectfully submitted,

ATTORNEYS FOR PLAINTIFF

Gerry Schulze
Arkansas Bar No. 83156
Eubanks, Baker and Schulze
303 President Clinton Ave, Ste D
Little Rock, AR 72201
(501)537-2000

Ruthanne N. Murphy
Arkansas Bar No. 90043

11711 Hermitage Rd., Ste 5
Little Rock, AR 72211
(501)224-2007

Dated:  May 13, 2008