**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

NABIL K. BISSADA                                                                            PLAINTIFF

v.                                     Case No. 4:08CV00362 JLH

ARKANSAS CHILDREN'S HOSPITAL,
SAMUEL SMITH, JONATHAN BATES,
ROBERT D.B. JAQUISS, TIMOTHY MARTIN,
MICHELLE MOSS, BONNIE TAYLOR,
ROBERT LYLE, SANDRA TAYLOR,
DEBRA BARROW, PATTI HIGGINBOTHAM,
AND JOHN AND JANE DOES 1–10                                            DEFENDANTS

<u>**OPINION AND ORDER**</u>

Nabil Bissada initiated this action against Arkansas Children's Hospital; Samuel Smith;

Jonathan Bates; Robert D.B. Jaquiss; Timothy Martin; Michelle Moss; Bonnie Taylor; Robert Lyle;

Sandra Taylor; Debra Barrow; Patti Higginbotham; and John and Jane Does 1–10.  In his amended

and substituted complaint, Bissada made federal claims under 42 U.S.C. § 1981; 42 U.S.C. §1985

(conspiracy to deprive one of civil rights); 15 U.S.C. § 2 (Sherman Act); 42 U.S.C. § 2000d (Title

VI); and 42 U.S.C. § 2000e (Title VII)  Bissada also alleged state law claims for retaliation under

the Arkansas Whistle-Blower Act, Ark. Code Ann. § 21-1-601; violation of the Arkansas Civil

Rights Act, Ark. Code Ann. § 16-123-101; defamation; and tortious interference with prospective

business relations and contracts.  The defendants filed three separate motions for summary

judgment—first, on the merits of Bissada's substantive claims; second, on the basis of settlement;

and third, on the basis of the charitable immunity doctrine.  In his responses to those motions,

Bissada has withdrawn his claims under 42 U.S.C. § 1985; the Sherman Act; and the Arkansas

Whistle-Blower Act.  For the following reasons, summary judgment is granted in favor of the

defendants on all remaining claims.

## I.

A court should enter summary judgment if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005). The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party carries its burden, the nonmoving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1985) (quoting FED. R. CIV. P. 56(e)) (emphasis in original). A genuine issue for trial exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. When a nonmoving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

## II.

The facts relevant to the resolution of the motions for summary judgment are as follows. Nabil Bissada, a urologist, was born in Cairo, Egypt, on September 2, 1938. In May 2003, the University of Arkansas for Medical Sciences (UAMS) hired Bissada as Vice Chairman of the Department of Urology. While employed with UAMS, Bissada also served as the Chief of Pediatric

Urology for Arkansas Children's Hospital (ACH).   In November 2006, Sandy Taylor, the Vice President of Patient Care Services, spoke with Dr. Bonnie Taylor, the Medical Director for ACH, about some of her concerns regarding Bissada's practice.   Sandy Taylor informed Bonnie Taylor that her concerns included patient care and outcomes, lack of communication between Bissada and patient families, repeated surgical and clinical cancellations, complications resulting from delayed surgical proceedings, and a lack of confidence in Bissada's abilities.   Bissada has continuously denied the legitimacy of the concerns regarding his practice.

After listening to Sandy Taylor's concerns, Bonnie Taylor brought those concerns to the Medical Staff Leadership Group.   Following the Medical Staff Bylaws, Taylor then requested "a mandatory clinical review by the Medical Staff Executive Committee" to review the complaints and determine if any action was necessary.   The Medical Staff Executive Committee held a special meeting on November 28, 2006, to discuss the concerns regarding Dr. Bissada.   In that meeting, the Executive Committee appointed Drs. Robert D.B. Jaquiss, Timothy W. Martin, and Robert Lyle to an Ad Hoc Committee to conduct an investigation, which it initiated on November 30, 2006.

The Ad Hod Committee's investigation included a review of patient records of eighteen of Bissada's patients, Press-Ganey surveys for Bissada, and data regarding clinic attendance and clinic cancellation.   On December 6, 2006, the Ad Hoc Committee met with Bissada and asked him about delays between the decision to perform a surgery and the performance of that surgery; complications arising from hypospadias repairs; Bissada's clinic cancellation rate; patient family complaints; on-call coverage; and the removal of labial adhesions in the clinic without anesthesia.   Bissada denies that any of the "complications" mentioned by the Ad Hoc Committee were in fact complications. As a result of its investigation, the Ad Hoc Committee issued a report with the following results: (1)

3

Bissada's consistent delays in the performance of surgical procedures led to questionable outcomes; (2) Bissada's lack of communication with local physicians and parents was a problem; (3) Bissada's cancellation rate for the clinic was excessive and unacceptable; (4) patients became lost in Bissada's practice due to the lack of an effective mechanism for completeness of patient follow-up; (5) the rate of complication in Bissada's cases was more frequent than the Ad Hoc Committee would ordinarily expect; and (6) there was a general lack of judgment on the part of Bissada.  Bissada contests the merit of the conclusions of the Ad Hod Committee's report.  ACH extended Bissada's privileges, which were set to expire on December 31, 2006, for one month.

Following its report, the Ad Hoc Committee recommended that the Executive Committee seek further review of the eighteen cases by an outside pediatric urologist.  The Executive Committee agreed to conduct the outside review and sent the information regarding the eighteen cases to Dr. Anthony H. Balcom, a pediatric urologist at the Children's Hospital and Health System in Milwaukee, Wisconsin.  After his review, Balcom made the following conclusions:

> 1)      I think there is definitely a pattern of highly irregular scheduling activities, it seems that long delays were introduced in terms of reconstructive procedures whereas at least on one occasion, an ablative procedure was accomplished very quickly;
> 2)      Some of the complications in this chart review of 18 series have been "expected," not uncommon complications, but the total number of cases done in this time period is not known to me, so interpretation of complication rates to compare to typical complication rates is not possible.
> 3)      I have a concern that the complication rate after pyeloplasty in terms of recurrent obstruction is concerningly high.

Bissada contests the merit of Balcom's first and third conclusions.

The Executive Committee reviewed Balcom's report in a meeting on January 9, 2007.  The meeting minutes indicate that Bissada was informed of his right to appear before the Executive

Committee but declined to attend.  According to Dr. Patti Higginbotham, both she and Dr. Taylor informed Bissada on multiple occasions of his right to attend the meeting and the purpose of the meeting, but Bissada contends that his invitation was confusing and misleading.  At the meeting, the Executive Committee voted to revoke Bissada's privileges effective immediately.  On January 10, 2007, Bissada received notice that his medical staff privileges had been revoked and that he was entitled to a hearing before an ad hoc committee of the medical staff to appeal the decision.

Bissada then requested a hearing before the Executive Committee and retained attorneys Donna and Robert McHenry to represent him.  The McHenrys commenced settlement talks with ACH's counsel, Lynda Johnson, hoping to reach an agreement whereby ACH would not report the revocation of Bissada's privileges to the National Practitioner Data Bank.  On May 21, 2007, Donna McHenry sent a letter to Johnson asking that ACH reinstate Bissada's privileges, report that it did so to the Data Bank, and cancel all further proceedings against him, in exchange for Bissada's agreement to resign voluntarily his privileges at ACH.  ACH rejected the settlement offer and scheduled the appeal hearing that Bissada had requested.

In May and June of 2007, the McHenrys requested depositions to prepare for the hearing. On June 5, 2007, Robert McHenry sent a letter to ACH extending another settlement offer.  Bissada states that he was aware of the June 5, 2007 letter and the continuing settlement negotiations, and he asserts that the material conditions under negotiation included the language that ACH would report to the Data Bank and his right to be reinstated and then resign his privileges.  On June 11, 2007, Johnson sent a letter to Robert McHenry informing him that the Executive Committee had set a meeting to discuss Bissada's June 5 settlement proposal.  In that letter, Johnson stated that an Executive Committee hearing was not a legal proceeding requiring depositions and discovery, but

Bissada maintains that it was unreasonable not to allow for depositions in preparation for the hearings.

On June 13, 2007, Johnson sent a letter to McHenry informing him that the Executive Committee had rejected Bissada's settlement offer and rescheduled the hearing for August 20, 2007. Bissada admits that he was aware of the June 13, 2007 letter.  On June 29, 2007, McHenry sent a letter confirming the August 20, 2007 hearing date.  On July 11, 2007, Johnson sent a letter to Robert McHenry stating that she had visited with the Executive Committee regarding a possible settlement. In exchange for Bissada's agreement to forgo any contest to the revocation of his privileges, the Executive Committee proposed submitting to the Data Bank the following language:

> Dr. Bissada's privileges were recommended to be revoked by the ACH Medical Staff Executive Committee as part of an investigation concerning his professional competency.  No final action was taken on the recommendation.

On August 7, 2007, Robert McHenry replied with Bissada's counteroffer.  In exchange for reinstatement of Bissada's privileges so that he could immediately resign thereafter, Bissada proposed that ACH report to the Data Bank the following language:

> Dr. Bissada's privileges were recommended to be revoked by the ACH Medical Staff Executive Committee as part of an investigation concerning his professional competency.  After a complete investigation, and an independent evaluation from an outside expert, no final action was taken on the recommendation.

The Executive Committee rejected the counteroffer on August 8, 2007.  On August 9, Johnson sent another offer proposing that ACH report to the Data Bank the following:

> Dr. Bissada's privileges were recommended to be revoked by the ACH Medical Staff Executive Committee as a part of an investigation concerning his professional competency.  Due to a settlement reached between the parties, his privileges expired before final action was taken on the recommendation.

Bissada rejected the August 9 proposal.

On August 17, 2007, three days before Bissada's requested hearing, Robert McHenry's paralegal, LaTosha White, sent an email to Johnson on McHenry's behalf.  The email read:

> Dear Lynda,
>
> Dr. Bissada will agree to the language proposed by you as set out as Exhibit A.
>
> This letter will also confirm that the hearing WILL NOT be held on Monday, August 20, 2007.  I will send a hard copy of this letter and Settlement Agreement on Monday.
>
> Sincerely, Robert McHenry

Attached to the email was a document titled "Settlement Agreement," which stated the following: "In consideration of the parties agreeing to the language to be sent to the National Practitioners' Data Bank (see attached Exhibit A) and Dr. Nabil Bissada's agreement to not reapply for privileges at ACH, ACH agrees to end its investigation and Dr. Bissada agrees not to reapply for privileges."  Also attached to the email was "Exhibit A"—the agreed-upon language to be reported to the Data Bank—which stated the following:

> Dr. Nabil Bissada's privileges were recommended to be revoked by the Executive Committee of the Arkansas Children's Hospital medical staff as part of an investigation concerning Dr. Bissada's professional competence.
> Pursuant to the ACH By-Laws, Dr. Bissada requested a hearing so that he could oppose the above mentioned recommendation.  Because a settlement was reached between the parties, Dr. Bissada's privileges expired before final action was taken.  Dr. Bissada chose not to reapply for privileges at Arkansas Children's Hospital.

In deposition testimony, Robert McHenry stated that he had met with Bissada prior to sending the email and discussed with him the settlement and attachments contained in the email. McHenry stated that his paralegal sent the email at his direction.  McHenry also testified that he spoke with Johnson over the telephone on the same day, and Johnson stated that the case was settled

and the August 20 hearing would be cancelled.

Bissada denies that the August 17 email constituted an offer of a settlement agreement that ACH could subsequently accept.  In deposition testimony, Bissada stated that he reviewed the "Settlement Agreement" and "Exhibit A" with Robert McHenry before they were emailed to Johnson, but he did not believe the documents to be a settlement agreement:

> Q.  Now, did you have the opportunity to review or go over that language with your attorneys?
> A.  Well, we had an ongoing negotiations.  And what this one—the way I understand it, and the way I believe it, this says, our—that we agree to the language.  And the way I understand it, this was not final.  There were things happening on the weekend and on Monday, and on Monday, we were going to do the final planning and look at everything.
> Q.  All right.  What was not final about the language contained in [the email and its attachments]?
> A.  That there would be some changes before we do anything in writing.
> Q.  And why did you think there would be some changes?
> A.  Because it says we will agree.  It is not agreed.
> Q.  Now, did you understand that the hearing for August 20, 2007, had been cancelled?
> A.  Now, that's the only thing that we agreed on at that time.
> . . .
> Q.  Now, did you have the opportunity to review the language that is contained in [Exhibit A] prior to it being sent to [ACH's counsel]?
> A.  Yeah, we looked at it.

After Johnson had spoken with McHenry and received the email and accompanying attachments from McHenry, ACH reported the language contained in "Exhibit A" to the Data Bank and cancelled the hearing set for the following Monday.  ACH made the report to the Data Bank on the afternoon of Friday, August 17, 2007.  The next day, on August 18, 2007, Bissada wrote a letter to Dr. Jonathan Bates at ACH.  Bissada wrote:

> The settlement agreement E-mailed by Mr. McHenry is not acceptable to me.  I will not sign this agreement.  I wish to engage another legal counsel as soon as possible.  And will notify you with his name once I do.  I would ask that a hearing would be

scheduled at a mutually acceptable time.

On Monday, August 20, 2007, Bissada faxed the letter to ACH and terminated the employment of

his attorneys, Robert and Donna McHenry.   On the same day, after receiving Bissada's letter,

Johnson wrote to Bissada and stated the following:

> There was a settlement reached between you and your legal counsel and ACH and
> me on Friday, August 17, 2007.  I received an e-mail confirming your agreement to
> the settlement from your legal counsel on Friday, August 17, 2007.  Based upon that
> settlement, actions were taken to cancel the hearing which had been set for August
> 20, 2007.

Johnson's letter also explained that the Executive Committee had decided that Bissada was not

entitled to another hearing and that he had not demonstrated good cause for postponement of the

hearing previously scheduled for August 20, 2007.

Bissada subsequently filed suit against ACH in Pulaski County Circuit Court on August 27,

2007.  In that complaint, Bissada stated that he and ACH had "'agreed to agree' to a settlement," but

that "[o]n the evening of August 17, 2007, Dr. Bissada decided that the proposed settlement was not

in his best interest, and asked that the August 20, 2007, hearing proceed as previously scheduled."

In an affidavit accompanying the complaint, Bissada testified that on August 17, 2007, he met with

the McHenrys regarding the language in the proposed settlement and that he "agreed to a cancellation

of a previously scheduled hearing with the other party on August 20, 2007."   In the affidavit,

however, Bissada stated that he did not consider that he had "agreed irrevocably to the proposed

terms of that agreement" and that he had "never in [his] life been a party to a final agreement without

[his] actual signature, and [he] did not intend to agree to the terms of the letter which has since been

sent to the National Practitioner Data Bank."

On January 22, 2008, Bissada filed a charge with the Equal Employment Opportunity

Commission.  Bissada alleged that ACH discharged him on January 9, 2007, because of his national

origin, Egyptian.  Seven days later, the EEOC issued a Notice of Suit Rights, dismissing his charge

because it was not timely filed and he had waited too long after the dates of the alleged

discrimination to file his charge.  Bissada then commenced this action in the Eastern District of

Arkansas on April 24, 2008.

## III.

**A.     42 U.S.C. § 1981**

Bissada alleges that the defendants violated his rights under 42 U.S.C. § 1981 by

discriminating against him because of his national origin and race.  Section 1981 provides, "All

persons within the jurisdiction of the United States shall have the same right in every State and

Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and

proceedings for the security of persons and property as is enjoyed by white citizens . . . ."  42 U.S.C.

§ 1981.  In *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 107 S. Ct. 2022, 95 L. Ed. 2d 582

(1987), the United States Supreme Court held that § 1981 forbids racial discrimination, or

discrimination against someone "because he or she is genetically part of an ethnically and

physiognomically distinctive sub-grouping of *homo sapiens*."  *Saint Francis College*, 481 U.S. at

613, 107 S. Ct. at 2028.  In that case, the petitioner, a United States citizen born in Iraq, alleged that

he had been discriminated against based on his Arabian race and ancestry in violation of § 1981.  *Id.*

at 604, 107 S. Ct. at 2023.  The Supreme Court held that the petitioner could make out a case under

§ 1981 if, on remand, he could "prove that he was subjected to intentional discrimination based on

the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his

religion."  *Id.* at 613, 107 S. Ct. at 2028.

Because § 1981 does not prohibit discrimination based on national origin, Bissada's § 1981 claims based on his national origin must be dismissed.  *See Gad-Tadros v. Bessemer Venture Partners*, 326 F. Supp. 2d 417, 425 (E.D.N.Y. 2004) (citing *Saint Francis College*, 481 U.S. at 613, 107 S. Ct. at 2028).  Bissada also makes a claim under § 1981 based on his race.  In his amended and substituted complaint, Bissada states that he is of Egyptian descent; that the defendants treated similarly situated white physicians of European ethnicity far better than they treated him; that his medical staff privileges were suspended because of his race; and that the defendants' discrimination interfered with his medical staff privileges and his right to contract with patients.

In support of its motion for summary judgment, ACH argues that Bissada bases his § 1981 claim solely on his national origin and that "Egyptian Copt" is not a distinct race protected from discrimination by 1981.  ACH cites to *Zar v. South Dakota Bd. of Examiners*, 976 F.2d 459 (8th Cir. 1992), in which the Eighth Circuit affirmed the district court's grant of summary judgment.  *Zar*, 976 F.2d at 467.  In that case, the plaintiff based his claim only on the fact that he was Iranian.  *Id.* His counsel repeated that position at oral argument and stated that he did not know whether his client was an Arab.  *Id.*  Because the plaintiff's § 1981 claim was based solely on his national origin, Iranian, his claim failed.  *Id.*  ACH also cites to *Ahmed v. Samson Mgmt. Corp.*, 1996 WL 183011 (S.D.N.Y. Apr. 17, 1996), and *Khair v. Campbell Soup Co.*, 893 F. Supp. 316 (D.N.J. 1995), for the proposition that § 1981 claims based solely on Egyptian birth are not actionable.  In *Ahmed*, the defendant moved to dismiss under Rule 12(b)(6), and the court dismissed the claim with leave to amend because the plaintiff's complaint merely indicated that Egypt was his nation of origin.  *Ahmed*, 1996 WL 183011, at *6.  In *Khair*, the plaintiff asserted that the defendant had "made unnecessary and disdainful references to his Egyptian heritage such as . . . remarks regarding camels

11

and Egyptian curses." *Khair*, 893 F. Supp. at 330.  The court held that the plaintiff had presented sufficient evidence to create a genuine issue of fact as to whether any discriminatory animus was based on the plaintiff's ancestry or origin, rather than his place of birth.  *Id.*

ACH also points to Bissada's deposition testimony as evidence that his § 1981 claim is based solely on his national origin.  In his deposition, Bissada testified that his race is Egyptian; that ACH's Dr. Smith had a history of discriminating against Christian Egyptians; that Sondra McNatt discriminated against him because he was an Egyptian; that Dr. Bates discriminated against him because of his national origin; and that Timothy Martin did not like Egyptians based on the way he treated Bissada.  ACH asserts that Bissada's testimony shows that his § 1981 claims are based solely on his Egyptian national origin.  ACH further argues that even if Egyptian Copt is a race, as opposed to a national origin or religion, Bissada has still failed to present sufficient evidence to show that the defendants intentionally discriminated against him based on his race.

In response, Bissada states that Egyptian Copts are a distinct ethnic group and that he alleged "race" as a ground for discrimination in his amended and substituted complaint.  Bissada argues that *Zar* and *Ahmed* are distinguishable from the present case.  In *Zar*, no effort was made to develop the issue of the plaintiff's ethnicity, as the plaintiff's complaint was based solely on the fact that he was Iranian, and his counsel could not say whether he was an Arab.  *Zar*, 976 F.2d at 467.  In *Ahmed*, the § 1981 claim was dismissed with leave to amend because the plaintiff alleged only that he was discriminated against because he was Egyptian.  *Ahmed*, 1996 WL 183011, at *6.  In the present case, Bissada argues, he has alleged that he was discriminated against due to his race and that his Egyptian Coptic ethnicity is a distinct race separate from his national origin, Egyptian.  Bissada also argues that *Khair* actually supports his case, insofar as the court held that a jury could find that the

12

source of any discriminatory animus was the plaintiff's ancestry or ethnic origin—Egyptian—rather than his place of birth.  *Khair*, 893 F. Supp. at 330.

Bissada complains that notes taken by Sandy Taylor, a nurse at ACH, show intentional discrimination.  Taylor's notes, which are fifteen pages in length, document multiple complaints by her and other nurses regarding Bissada's behavior and practice, and on a few occasions the notes make reference to "cultural" differences between Bissada and his co-workers when describing possible reasons for difficulties.  However, the notes are not replete with accusations of cultural issues, nor do the notes specifically target Bissada's Egyptian Copt heritage.  Bissada also complains that ACH Dr. Samuel Smith engaged in intentional discrimination against him.  Bissada presented affidavits from two other Egyptian Copt doctors, Nabil Salib and Christine Habib, both of whom state that Smith treated them differently and more harshly than their white counterparts based on their Egyptian Copt ethnicity.  Bissada states that Smith told him on one occasion, "I don't want you to do [anything with the Da Vinci Robotic Surgery System.]  I don't want anything to do with you. You are not one of us."  Nothing about Smith's alleged statement, or any other alleged act or statement attributed to Smith, indicates an explicit disdain for Bissada's Egyptian Copt ethnicity.[1]

The *McDonnell Douglas* burden-shifting framework governs claims of race discrimination under § 1981.  *Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1196 (8th Cir. 2006) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 186–87, 109 S. Ct. 2363, 105 L. Ed. 2d 132

---

[1]ACH states that Bissada conceded that Smith may have meant that Bissada was not a general surgeon like Smith because the comment was made in the context of discussing the general surgery group, citing to pages 108–09 of Bissada's deposition testimony.  Although not disputed by Bissada, the Court has been unable to locate those pages of Bissada's deposition testimony in the record, as the parties have submitted only redacted copies of that testimony, not including pages 108–09.

(1989)); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1056 (8th Cir. 1997) ("The analysis applicable to . . . 42 U.S.C. § 1981 claims in employment cases is the familiar three-part framework initially set out in *McDonnell Douglas* . . . .").  Bissada must first establish a prima facie case of discrimination. The burden then shifts to ACH to present a legitimate reason for the alleged discriminatory action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973).  If ACH does so, the burden shifts back to Bissada to establish that the asserted legitimate reason is a mere pretext for a discriminatory action.  *Id.*

Even if Egyptian Copt is a distinct race for purposes of a § 1981 claim, and even if Bissada established a prima facie case based on the alleged discriminatory actions of Taylor and Smith, he has not presented evidence sufficient to rebut ACH's showing of a legitimate, nondiscriminatory reason for Bissada's discharge.  *See Hartson v. Chappell*, 2009 WL 252290, at *4 (E.D. Ark. Jan. 30, 2009) ("Even assuming plaintiff can establish a *prima facie* case, he must do more than simply discredit an employer's non-discriminatory reason.  He must present evidence to support a finding that the real reason for his termination was race.") (citing *Nelson v. Boatmen's Banchsares, Inc.*, 26 F.3d 796, 801 (8th Cir. 1994)).  Federal district courts do no sit as super-personnel departments with the power to second-guess an employer's business decisions.  *Groves v. Cost Planning and Mgmt. Int'l, Inc.*, 372 F.3d 1008, 1010 (8th Cir. 2004); *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995).  The Ad Hoc Committee report makes no mention of Bissada's race, nationality, or national heritage.  The Executive Committee, which reviewed the Ad Hoc Committee report as well as the outside review by Dr. Balcom, also does not mention Bissada's race or that he is an Egyptian Copt.  Both the Ad Hoc and Executive Committees gave professional reasons unrelated to race for the revocation of Bissada's privileges.  Thus, ACH has shown a legitimate,

nondiscriminatory reason for the revocation of Bissada's privileges.

Bissada has not shown that ACH's stated reason is mere pretext for a discriminatory action. Although Bissada may disagree with the decisions of the Ad Hoc and Executive Committees, he has presented no evidence showing that Taylor and Smith exerted control over or influenced the committees' decisions. There is no evidence that Taylor and the other nurses revoked or had the power to revoke Bissada's privileges at ACH, nor is there evidence that Smith had any control or exerted any influence over the Ad Hoc Committee's investigation or the Executive Committee's decision to revoke Bissada's privileges, which is the injury alleged as the basis for his § 1981 claim.[2] Thus, even if Bissada could establish a prima facie case based on the actions of Taylor and Smith, he has not shown that ACH's stated reason was mere pretext. Because Bissada has failed to present sufficient evidence to show that the Ad Hoc Committee or Executive Committee revoked his privileges based on his race, summary judgment is granted in favor of the defendants on Bissada's §1981 claim.

## B.     TITLE VII

Bissada makes a claim against ACH for employment discrimination under Title VII, 42 U.S.C. § 2000e *et seq.* In order to file a Title VII action, a plaintiff must first file an administrative charge with the EEOC within 180 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1); *see also Diaz v. Swift-Eckrich, Inc.*, 318 F.3d 796, 798 (8th Cir. 2003) (dismissing a Title VII claim as time-barred where the alleged unlawful employment practice occurred more than 180 days before the plaintiff filed her EEOC charge). If, after review of the charge, the EEOC issues

---

[2]Bissada admitted in deposition testimony that he had no evidence that Smith spoke with any member of the Ad Hoc or Executive Committees.

a notice of right to sue, the plaintiff then has 90 days to file suit based on the allegations contained in the EEOC charge.  42 U.S.C. § 2000e-5(f)(1).

Bissada filed his EEOC charge on January 22, 2008.  He complained of discrimination based on his national origin, stating that he believed that his discharge on January 9, 2007, was because of his national origin, Egyptian.  Bissada did not allege any acts of discrimination that occurred within 180 days of the January 22, 2008 filing.  On January 29, 2008, the EEOC issued its dismissal of Bissada's charge because it was not timely filed—he waited too long after the date of the alleged discrimination to file his charge.  Bissada then initiated this action within 90 days of receiving notice of his right to sue.  Bissada alleges that ACH discriminated against him based on his race and national origin when it made its report to the Data Bank on August 17, 2007, and when it revoked his privileges and denied him a hearing on August 20, 2007.  Bissada also alleges that ACH treated white doctors and doctors of European ancestry better than it treated him.

The Court finds that Bissada's Title VII claim is untimely.  The only alleged act of discrimination in Bissada's EEOC charge is the revocation of his privileges on January 9, 2007, which is more than 180 days before he filed his EEOC charge on January 22, 2008.  In his EEOC charge, Bissada does not allege that he was treated differently than other white doctors or doctors of European ancestry, nor does he mention ACH's report to the Data Bank or ACH's refusal to conduct further hearings.

Bissada argues that his discrimination claim did not arise until his right to a hearing was denied on August 20, 2007, and that ACH's report to the Data Bank constituted an independent act of discrimination.  In support of and response to a separate motion for summary judgment on the basis of settlement (Docket #23), the parties have briefed the issue of whether Bissada and ACH

16

entered into a settlement agreement on August 17, 2007.  Bissada argues that because he did not enter into a settlement agreement, the report to the Data Bank and denial of a hearing were adverse employment actions to which he did not consent.  Therefore, Bissada concludes, the report to the Data Bank and denial of his hearing are acts of discrimination that occurred well within 180 days of his filing the EEOC charge.

Bissada admits that he was aware that his attorneys, the McHenrys, were in settlement negotiations with Johnson, ACH's attorney.  Bissada had rejected an ACH settlement offer on August 9, 2007.  However, on August 17, 2007, Bissada extended an offer to ACH.  Bissada admits that he met with Robert McHenry and approved the language contained in the August 17, 2007 email sent by McHenry's paralegal, LaTosha White, that purported to be a settlement agreement.  That email contained an attachment entitled "Settlement Agreement" and an "Exhibit A," which was the agreed-upon language that ACH was to report to the Data Bank.  The email states that Bissada agreed to the language in Exhibit A and to the cancellation of his review hearing.  Bissada admitted in deposition testimony that he agreed to the cancellation of the review hearing and to the language contained in Exhibit A, but he stated that he did not consider the entirety of the agreement to be a binding settlement agreement.  On the same day that White sent the email to Johnson, McHenry spoke with Johnson over the phone, and both agreed that the case was settled.  In a letter faxed to ACH on August 20, 2007, Bissada referenced the agreement as a "settlement agreement," stated that it was no longer acceptable to him and that he would not sign it, and said he would be hiring a new attorney.

The terms of the agreement reached on August 17, 2007, may not have included a release of liability sufficient to preclude Bissada from filing a Title VII or other type of discrimination suit

against ACH.  However, it is clear from the record that Bissada agreed to the language that McHenry communicated to Johnson as an offer, which Johnson thereafter accepted, forming a contract or agreement.  *See Ark. Anthracite Coal & Land Co. v. Dunlap*, 142 Ark. 358, 218 S.W. 839, 841 (1920) ("If . . . there was a completed oral agreement, the parties were bound by it, even though it was to be reduced to writing."); *Traylor v. Fulcher*, 1983 WL 766, at *2 (Ark. App. July 6, 1983) (noting that where attorneys were conducting settlement negotiations with specific authority from their clients, an oral agreement for settlement was binding and the client's signature on the written agreement was not essential to finalize the parties' contract) (citing *McKenzie v. Boorhem*, 117 F. Supp. 433 (W.D. Ark. 1954)).  Acting in reliance on that agreement, ACH issued to the Data Bank a report using the language contained in the agreed-upon Exhibit A from the email, and ACH cancelled the meeting set for August 20, 2007, as Bissada had requested.

At some point after Bissada's offer was extended on August 17, 2007, Bissada apparently changed his mind.  Bissada did not communicate his desire to withdraw his offer until August 20, 2007, but by that time ACH had already accepted his offer, issued the agreed-upon report to the Data Bank, and cancelled his hearing.  Because Bissada agreed to the actions of which he now complains—namely, the report to the Data Bank and the denial of his hearing—those actions cannot constitute discriminatory acts forming the basis of a Title VII claim.  The other alleged instances of discrimination in Bissada's Title VII claim occurred more than 180 days before he filed his EEOC charge.  Therefore, Bissada's Title VII claim is untimely, and summary judgment is granted in favor of ACH on the Title VII claim.

C.    TITLE VI

Bissada's remaining federal claim is based upon Title VI.  Section 601 of Title VI provides

18

that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.  The penultimate provision of Title VI, § 604, states the following:  "Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except when a primary objective of the federal financial assistance is to provide employment." 42 U.S.C. § 2000d-3.  Thus, Bissada must show not just that ACH received federal funds, but also that the primary objective of federal financial assistance to ACH is to provide employment.

In support of his argument that ACH is subject to a Title VI suit, Bissada cites the Court to *United States v. Harris Methodist Fort Worth*, 970 F.2d 94, 99 (5th Cir. 1992) (holding that Title VI covers physician staff privileges).  That case is distinguishable from the facts here.  In *Harris Methodist*, the Department of Health and Human Services (DHHS) sought to conduct a Title VI compliance review of physician staff privileges.  *Harris Methodist*, 970 F.2d at 95–96.  DHHS appealed a ruling that the proposed Title VI compliance review was an unreasonable warrantless search, and Harris Methodist appealed a ruling that Title VI applied to physician staff privileges. *Id.* Here, Bissada is making a claim for national origin and race discrimination under Title VI based on the fact that ACH receives Medicare/Medicaid reimbursements.

The parties have not cited, and the Court has not found, any cases from the Eighth Circuit dealing with the issue of whether Medicare/Medicaid payments to a hospital are sufficient to create Title VI liability.  A number of cases have held, however, that Title VI applies only to the "recipient" of federal funds and that a Title VI plaintiff must show that the received funds were used for

employment.  In *Valentine v. Smith*, 654 F.2d 503, 512 (8th Cir. 1981), the Eighth Circuit dismissed a plaintiff's Title VI claim because she failed to show that the university defendant used its federal assistance for the purpose of providing faculty employment.  *Valentine*, 654 F.2d at 512 ("Section 2000d-3 limits employment discrimination claims under [T]itle VI to situations where the federal assistance is designed to provide employment."); *see also Widmar v. City of Kansas City, Mo.*, 2006 WL 743171, at *2 (W.D. Mo. Mar. 20, 2006) ("Although the Eighth Circuit has not addressed individual liability under Title VI, the few courts that have considered the question conclude that it is limited to the 'recipient' of the funds.") (citing *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1170 (11th Cir. 2003)).

Other cases have held that Medicare/Medicaid payments do not trigger Title VI because their intended beneficiaries are the patients, not the employment of physicians.  In *Doe v. St. Joseph's Hosp. of Fort Wayne*, 788 F.2d 411 (7th Cir. 1986), a physician brought an action against a hospital and its board of directors after he lost his staff privileges, alleging violation of Title VI.  *Doe*, 788 F.2d at 418–19.  Because the legislative history of Title VI "lends strong support to the conclusion that Congress did not intend to extend protection under Title VI to any person other than an intended beneficiary of federal financial assistance," and because the intended beneficiaries of Medicare/Medicaid do not include the physician, the Seventh Circuit affirmed dismissal of the physician's Title VI claim.  *Id.* at 419–20 (quoting *Simpson v. Reynolds Metal Co.*, 629 F.2d 1226, 1235 (7th Cir. 1980)) (overruled on other grounds).  In *Bhatt v. Uniontown Hosp.*, 1986 WL 30681 (W.D. Pa. Mar. 20, 1986), the court considered the issue of whether the creation of employment opportunities was a primary objective of Medicare/Medicaid payments to a hospital, such that § 604 of Title VI was satisfied.  *Bhatt*, 1986 WL 30681, at *6.  Because Medicare and Medicaid "were

enacted to ensure that the aged, disabled, poor and otherwise disadvantaged would be able to secure necessary medical treatment and services," as opposed to benefitting primarily the employment of physicians, the court held that the plaintiff physician's failure to receive staff privileges did not constitute grounds for a Title VI suit.  *Id.* (citing 42 U.S.C. § 1395; *United States v. Baylor*, 736 F.2d 1039, 1044 (5th Cir. 1984)); *see also Vuciecevic v. MacNeal Memorial Hosp.*, 572 F. Supp. 1424 (N.D. Ill. 1983) (holding that a physician plaintiff's Title VI suit failed because he "obviously [was] not an intended beneficiary of" Medicare/Medicaid and relied only on Medicare/Medicaid payments to the hospital as a basis for his Title VI suit).

Bissada urges this Court to adopt a very broad construction of Title VI and hold that the Medicare/Medicaid payments to ACH are sufficient to trigger Title VI liability.  However, the Court finds persuasive the reasoning in *Doe* and *Bhatt*, that Medicare/Medicaid payments inure to the benefit of aged, disabled, poor, and otherwise disadvantaged patients, rather than to the employment of physicians like Bissada.  Based on the prevailing case law, and relying strongly on the Eighth Circuit's decision in *Valentine*, the Court holds that Bissada has failed to show that the federal assistance received by ACH was used directly to provide employment for its physicians.  Even if ACH could be subject to a Title VI action, Bissada has not presented sufficient evidence that the actions taken by the Ad Hoc Committee and Executive Committee in revoking his privileges were based on or colored by national origin or race discrimination.  Therefore, summary judgment is granted in favor of ACH on Bissada's Title VI claim.

## D.   STATE LAW CLAIMS

Because Bissada has failed to present sufficient evidence on his federal claims, the Court need not consider the merits of his state-law claims.  If the district court dismisses all claims over

which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over state-law claims. 28 U.S.C. § 1367(c)(3). Out of deference and respect for the courts of the State of Arkansas, this Court will exercise its discretion to decline to exercise supplemental jurisdiction with respect to Bissada's state-law claims. *Concor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990) (stating that, after dismissing the federal claims, the district court should have exercised its discretion to decline pendent jurisdiction because of "the necessity to provide great deference and comity to state court forums to decide issues involving state law questions."); *Roeben v. BG Excelsior Ltd. P'ship*, No. 4:06CV01643, 2008 WL 54916, at *3 (E.D. Ark. Jan. 3, 2008).

## CONCLUSION

For the foregoing reasons, Bissada has failed to present sufficient evidence to create a genuine issue of material fact regarding his § 1981, Title VII, and Title VI claims. Bissada has withdrawn his remaining federal claims, and the Court declines to exercise supplemental jurisdiction over his state-law claims. Therefore, summary judgment is granted in favor of ACH and the individual defendants on the claims arising under federal law. The defendants' motion for summary judgment on Bissada's substantive claims is GRANTED as to the claims arising under federal law (Docket #28). The motions for summary judgment on the basis of settlement (Docket #23) and the charitable immunity doctrine (Docket #20) are DENIED as moot. Bissada's state-law claims are dismissed without prejudice.

IT IS SO ORDERED this 14th day of April, 2009.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

22